Slip Op. 16-117

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **UNION STEEL MANUFACTURING COMPANY, LTD.,**<br><br>      Plaintiff,<br><br>  and<br><br>**WHIRLPOOL CORPORATION,**<br><br>      Plaintiff-intervenor,<br><br>  v.<br><br>**UNITED STATES**,<br><br>      Defendant,<br><br>  and<br><br>**UNITED STATES STEEL CORPORATION, NUCOR CORPORATION, and HYUNDAI HYSCO,**<br><br>      Defendant-intervenors. | **Before: Timothy C. Stanceu, Chief Judge**<br><br>**Consol. Court No. 10-00106** |

## OPINION

[Affirming a decision issued in response to court order in an action stemming from an antidumping duty proceeding on certain corrosion-resistant carbon steel flat products from the Republic of Korea]

Dated:December 15, 2016

  *Brady W. Mills* and *Donald B. Cameron*, Morris, Manning & Martin, LLP, of Washington, DC, argued for plaintiff Union Steel Manufacturing Company, Ltd.  With them on the brief were *Julie C. Mendoza*, *R. Will Planert*, *Mary S. Hodgins,* and *Sarah S. Sprinkle.*

  *Donald B. Cameron*, Morris, Manning & Martin, LLP, of Washington, DC, argued for plaintiff Dongbu Steel Company, Ltd.  With him on the brief were *Brady W. Mills, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins*, and *Sarah S. Sprinkle*.

  *Donald Harrison*, Gibson, Dunn & Crutcher, LLP, of Washington, DC, for plaintiff-intervenor Whirlpool Corporation.

*L. Misha Preheim*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of counsel for defendant was *Michael Thomas Gagain*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Jeffery David Gerrish* and *Robert E. Lighthizer*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for plaintiff and defendant-intervenor *United States Steel Corporation*.

*Timothy C. Brightbill*, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor Nucor Corporation.  With him on the brief was *Alan H. Price*.

*J. David Park*, Arnold & Porter LLP, of Washington, DC, for plaintiff and defendant-intervenor Hyundai HYSCO.

Stanceu, Chief Judge: In this consolidated action, four plaintiffs contested an administrative determination that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the fifteenth periodic administrative review of an antidumping duty order on certain corrosion-resistant carbon steel flat products (the "subject merchandise") from the Republic of Korea ("Korea").[1]  Before the court is a determination (the "Second Remand Redetermination") Commerce issued in response to the court's order in *Union Steel Mfg. Co., Ltd. v. United States*, 38 CIT __, 968 F. Supp. 2d 1297 (2014) (*"Union Steel II"*).  *Results of Redetermination Pursuant to Remand* (Aug. 1, 2014), ECF Nos. 222 (Conf.), 223 (Public) (*"Second Remand Redetermination"*).  The court affirms the Second Remand Redetermination.

---

[1] Due to the presence of common issues, the court consolidated three cases under Consol. Court No. 10-00106.  Order (May 13, 2010), ECF No. 46.  Consolidated with *Union Steel Mfg. Co., Ltd. v. United States*, Court No. 10-00106, are *Dongbu Steel v. United States* (Court No. 10-00109), *Hyundai HYSCO v. United States* (Court No. 10-00127), and *United States Steel Corp. v. United States* (Court No. 10-00139).

# I. BACKGROUND

Background on this case is provided in the court's two previous opinions and orders. *See Union Steel Mfg. Co., Ltd. v. United States*, 36 CIT __, 837 F. Supp. 2d 1307 (2012) (*"Union Steel I"*); *Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1300-02. In this Opinion and Order, the court supplements that background information.

## A.  The Parties to this Action

Three of the four plaintiffs in this action, Union Steel Manufacturing Co., Ltd. ("Union"), Hyundai HYSCO ("HYSCO"), and Dongbu Steel Co., Ltd. ("Dongbu"), are Korean producers and exporters of the subject merchandise. Union and HYSCO were mandatory respondents in the fifteenth administrative review; Dongbu was an unexamined respondent. The remaining plaintiff, United States Steel Corporation ("U.S. Steel"), was a petitioner in the fifteenth administrative review and is a defendant-intervenor in this action. Nucor Corporation ("Nucor") also was a petitioner in the fifteenth administrative review and also is a defendant-intervenor.

## B.  The Contested Determination

The administrative determination contested by the four plaintiffs ("Final Results") is *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Fifteenth Admin. Review*, 75 Fed. Reg. 13,490 (Mar. 22, 2010) (*"Final Results"*). The fifteenth review pertained to entries of subject merchandise made during the period of August 1, 2007 through July 31, 2008 ("period of review" or "POR"). *Final Results*, 75 Fed. Reg. at 13,490. In the Final Results, Commerce incorporated by reference an Issues & Decision Memorandum ("Decision Memorandum"). Issues & Decision Mem., A-580-816, ARP 07-08 (Mar. 15, 2010) (Admin.R.Doc. No. 5249) (*"Decision Mem."*). In the Final Results, Commerce assigned weighted-average dumping margins of 14.01% to Union and 3.29% to

HYSCO.  *Final Results*, 75 Fed. Reg. at 13,491.  As an unexamined respondent, Dongbu

received the margin of 8.65% that Commerce assigned to all unexamined respondents, which

Commerce calculated as a simple average of the non-*de-minimis* margins of the examined

respondents.  *Id.*

<u>C.  The Redeterminations Commerce Issued in Response to the Court's Orders</u>

Commerce issued a redetermination in response to the court's order in *Union Steel I.*

*Results of Redetermination Pursuant to Remand* (Sept. 24, 2012), ECF No. 161 (*"First Remand*

*Redetermination"*).  In that redetermination ("First Remand Redetermination"), Commerce

revised Union's margin from 14.01% to 9.85% and HYSCO's margin from 3.29% to 1.46%.  *Id.*

at 67.  Again assigning Dongbu a margin based on a simple average of the margins calculated for

Union and HYSCO, Commerce changed Dongbu's margin from 8.65% to 5.56%.  *Id.*

Following consideration of comments submitted to the court on the First Remand

Redetermination and an oral argument, the court issued its decision in *Union Steel II*.  In

response, Commerce issued the Second Remand Redetermination, now before the court.  In the

Second Remand Redetermination, Commerce revised the 9.85% margin it previously determined

for Union to 9.83%.  *Second Remand Redetermination* 44.  It revised HYSCO's margin from

1.46% to 5.56%.  *Id.*  Once again assigning Dongbu a margin based on a simple average of the

Union and HYSCO margins, Commerce changed Dongbu's margin from 5.56% to 7.70%.  *Id.*

Union and Dongbu commented in opposition to the Second Remand Redetermination,

each raising essentially the same objections.  Comments of Union Steel on the U.S. Dep't of

Commerce's Aug. 1, 2014 Results of Redetermination Pursuant to Remand (Sept. 16, 2014),

ECF Nos. 231 (Conf.), 232 (Public) (*"Union's Comments"*); Comments of Dongbu Steel on the

U.S. Dep't of Commerce's Aug. 1, 2014 Results of Redetermination Pursuant to Remand

(Sept. 16, 2014), ECF No. 233.  (*"Dongbu's Comments"*).  HYSCO opposed the Second

Remand Redetermination on a different ground.  Response of Hyundai HYSCO to Defendant's

Second Redetermination on Remand (Sept. 16, 2014), ECF Nos. 234 (Conf.), 235 (Public).

Defendant responded to these comment submissions.  Def.'s Resp. to Comments on the Second

Results of Redetermination Pursuant to Court Remand (Oct. 29, 2014), ECF Nos. 244 (Conf.),

245 (Public).  The court held a second oral argument on April 16, 2015.  ECF No. 260.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c) (2006), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a, including an action

contesting the final results of an administrative review that Commerce issues under

section 751 of the Tariff Act, 19 U.S.C. § 1675(a).[2]  When reviewing a determination of

Commerce, including one issued in response to an order of remand, the court "shall hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law. . . ."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

### B.  Decisions in the Second Remand Redetermination to which No Party Objects

In *Union Steel II*, the court sustained the First Remand Redetermination in part and

remanded the decision to Commerce with the directive that Commerce reconsider the position

taken on certain specific issues.  With respect to four of the issues the court ordered Commerce

---

[2] All statutory citations herein are to the 2006 edition of the United States Code and all
citations to regulations are to the 2010 edition of the Code of Federal Regulations.

to reconsider, no party has objected to the resolution Commerce reached in the Second Remand

Redetermination.  Those four issues are discussed below.

1.  Nucor's Objections to the Calculation of Union's Interest Expense Ratio

In *Union Steel II*, the court noted that Nucor had raised certain objections to the

Department's method for redetermining Union's interest expense ratio.  The court discussed

these objections in detail in *Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1307-08.  In brief

summary, Nucor argued that Commerce should not have made a major input adjustment for steel

coil when calculating the interest expense ratio and that even if it was permissible to do so,

Commerce erred by using a method that double counted the major input adjustment.  *Id.*

Without opining on the merits of Nucor's objections, the court concluded that Commerce had

failed to address these objections in the First Remand Redetermination and must do so in

response to the order the court was issuing in *Union Steel II.  Id.*, 38 CIT at __, 968 F. Supp. 2d

at 1308.

In the Second Remand Redetermination, Commerce has responded to both of Nucor's

objections.  Commerce explained, first, that the major input adjustment Commerce made to the

cost of direct materials as part of the calculation of the cost of manufacturing ("COM")

necessitated a conforming change to the cost of sales ("COS") denominator that was used in the

calculation of the interest expense ratio because the ratio was applied to the product-specific

COM that included the major input adjustment.  *Second Remand Redetermination* 8.  According

to Commerce, "[t]his methodology ensured that the financial expense ratio and the COM to

which the ratio was applied were on the same basis."  *Id.* (footnote omitted).  Second, Commerce

explained that it was necessary to adjust the COS denominator for the major input adjustment to

ensure that the total interest expenses allocated to specific products is not higher than the

expenses Union actually incurred.  *Id.*

      Nucor did not file comments on the Second Remand Redetermination with the court.

Because Commerce has provided a reasonable explanation and because Nucor raised no

objection to that explanation, the court affirms the Department's resolution of the two issues

Nucor raised previously as to the interest expense ratio.

2.  Revision to the Recovery-of-Costs Test Used in the Calculation of Normal Value for HYSCO

      In the Final Results, Commerce used a "quarterly cost methodology," under which

Commerce determined the cost of production ("COP") of the foreign like product on a quarterly

basis rather than on an annual, POR-wide basis.  *See Union Steel I*, 36 CIT at __, 837 F. Supp. 2d

at 1322-23, *Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1308-10.  Under

section 773(b)(2)(D) of the Tariff Act, 19 U.S.C. § 1677b(b)(2)(D), a sale of the foreign like

product in the home market may not be excluded from the normal value calculation as a below-

cost sale if the price paid is "above the weighted average per unit cost of production for the

period of . . . review."  In *Union Steel II*, the court concluded that an aspect of this "recovery-of-

costs" test that Commerce applied to HYSCO in the First Remand Redetermination did not

comply with the statutory rule, under which "Commerce must calculate the weighted average per

unit cost of producing the good sold in the home market, and it must do so on a POR-wide (in

this case, yearly) basis."  *Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1311.  Upon

implementing its quarterly cost methodology, Commerce used a "surrogate" cost (determined

from the next most similar product) or an indexed cost, rather than an actual cost of production,

where a home market sale of a particular product (identified by control number, or "CONNUM")

occurred in a quarter for which the record contained no home market cost data for the production

of that CONNUM.  *Id.*, 38 CIT at __, 968 F. Supp. 2d at 1310.

In the Second Remand Redetermination, Commerce revised its recovery-of-costs test as

applied to HYSCO.  Discontinuing reliance on surrogate costs, Commerce "relied upon

HYSCO's actual costs from the quarters in which there was production during the POR to

calculate HYSCO's weighted-average POR cost for each CONNUM for use in the recovery-of-

cost test."  *Second Remand Redetermination* 12 (footnote omitted).  Because no party objected to

the Department's change in methodology, and because the change accords with the decision the

court reached in *Union Steel II*, the court affirms this aspect of the Second Remand

Redetermination.

3.  The Department's Use of Unindexed Quarterly Cost Data to Calculate Constructed Value and
DIFMER Adjustments for Union and HYSCO

Commerce applied its quarterly cost methodology in the fifteenth review because it

determined that the cost of a major input, steel coil substrate, changed significantly during the

POR and that this changing cost was reasonably correlated with prices.  *Second Remand*

*Redetermination* 14.  Commerce considered a cost change "significant" if it was a 25% or greater

change in the quarterly average cost of manufacturing a given product, from the lowest-cost

quarterly COM to the highest-cost quarterly COM, as a percentage of the lowest-cost quarterly

COM.  *Id.* at 15.  Commerce applied a quarterly cost method in conducting its recovery-of-costs

test pursuant to 19 U.S.C. § 1677b(b)(2)(D) and also used a quarterly cost method in calculating

constructed value ("CV") (*see* 19 U.S.C. § 1677b(b)(e)) and in making the difference-in-

merchandise ("DIFMER") adjustment to normal value, calculated as the difference in variable

cost of manufacturing associated with differences in physical characteristics between a subject

product sold in the United States and a product sold in the comparison market (here, the home

market) that is similar but not identical, with which the subject product is considered by

Commerce for comparison.[3]

In the fifteenth review, Commerce also "indexed" the cost of the substrate to a "common

period cost level," by which indexing it intended to neutralize the effect of the cost changes for

the input between quarters.  *See Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1309 & n.12.

Following defendant's request that the court remand this matter so that Commerce could review

its indexed quarterly cost methodology as applied to the cost recovery test, the court instructed

Commerce to reconsider its use of the quarterly cost methodology, including the use of indexing,

wherever it was used in the Final Results.  *Id.*, 38 CIT at __, 968 F. Supp. 2d at 1309-10.  In the

First Remand Redetermination, Commerce stated that "[i]n the intervening time since the

Department issued the final results in this review in March 2010, the Department has revised its

approach in performing the cost recovery test so that it no longer indexes when calculating

quarterly and annual weighted average costs."  *First Remand Redetermination* 16.

In the Second Remand Redetermination, Commerce stated that it used unindexed

quarterly cost data to calculate constructed value and DIFMER.  *Second Remand*

*Redetermination* 12.  Commerce explained that, consistent with its use of the quarterly cost

method to determine cost of production ("COP") in identifying below-cost sales, it decided also

to use its quarterly cost method for constructed value and for DIFMER in order to avoid

distortions in its dumping analysis, noting that "[t]he CV and DIFMER adjustment are derived

from the same CONNUM-specific costs as the COP."  *Id.* at 15.  Commerce explained, further,

that "[b]ecause the CV and DIFMER adjustment are also used in price-to-cost or price-to-price

---

[3] Commerce, however, generally will not compare products for which the DIFMER adjustment is more than 20 percent of the total cost of manufacture of the U.S. product.  TRADE & ENFORCEMENT COMPLIANCE, U.S. DEPT. OF COM., 2015 ANTIDUMPING MANUAL 63 (2015).

comparisons, respectively, it follows that the dumping analysis would be distorted if the

Department failed to calculate the CVs and the DIFMER adjustments in the same manner as the

COP." *Id.*

Because Commerce has provided a reasonable explanation for its decision to use its

unindexed quarterly cost method for CV and DIFMER purposes, and because no party has

objected to this decision, the court affirms this aspect of the Second Remand Redetermination.

<u>4.  Use of a Surrogate-Based Method in Calculating Constructed Value and DIFMER</u>

In *Union Steel II*, the court noted that the First Remand Redetermination did not inform

the court whether using quarterly costs influenced a decision to use surrogate costs for CV and

DIFMER in a manner similar to that the court found objectionable in the application of the

recovery-of-costs test to HYSCO when quarterly CONNUM-specific data were unavailable.

*Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1312.  In the Second Remand Redetermination,

Commerce stated that "[w]hile the Department did calculate costs for certain CONNUMs that

were sold but not produced in a given quarter using a surrogate-based methodology, the method

used is different than that which the Court found objectionable with respect to HYSCO's

recovery of costs." *Second Remand Redetermination* 21.  Commerce explained that for CV and

DIFMER, Commerce used the actual costs associated with production of the CONNUM, except

that "[w]hen there was no production of a CONNUM in a particular quarter for which a CV or a

DIFMER adjustment is needed, the Department selected the next most similar CONNUM, based

on the physical characteristics, that was produced in the same quarter." *Id.*  Commerce stated,

further, that "[t]he Department then added only the material cost for that surrogate CONNUM, to

the actual POR weighted-average direct labor, variable overhead, and fixed overhead of the

original CONNUM, to calculate the total cost of manufacturing of the CONNUM." *Id.*

The explanation Commerce provided responds to the court's question in *Union Steel II* as to the use of surrogate costs for constructed value and DIFMER.  For this reason, and because no party objects to the Department's resolution of this issue, the court affirms this aspect of the Second Remand Redetermination.

### C.  Date of Sale of HYSCO's Subject Merchandise

For sales that HYSCO made through its U.S. affiliate, Hyundai HYSCO USA, Inc. ("HHU"), to unaffiliated customers in the United States, Commerce used as the dates of sale the dates the subject merchandise was shipped to the affiliate from Korea.  *Union Steel I*, 36 CIT __, 837 F. Supp. 2d at 1334.  U.S. Steel claimed that the decision to use the dates of shipment as the dates of sale, rather than the invoice dates, was inconsistent with the Department's regulation, 19 C.F.R. § 351.401(i), and unsupported by substantial record evidence.  *Id.*; *Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1319.  In response to U.S. Steel's claim, defendant moved that the issue be remanded to Commerce for reconsideration, and the court granted this motion. *Union Steel I*, 36 CIT __, 837 F. Supp. 2d at 1335.

In the First Remand Redetermination, Commerce again decided to use the dates of shipment, rather than the invoice dates, as the dates of sale.  *Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1319 (citing *First Remand Redetermination* 62).  The court held that Commerce erred in doing so because it had not made a valid finding, as required by 19 C.F.R. § 351.401(i), that a date other than the date of invoice better reflected the date on which the material terms of sale were established.  *Id.*, 38 CIT at __, 968 F. Supp. 2d at 1324-26.

In the Second Remand Redetermination, Commerce reversed its position, stating that "[h]aving reconsidered the issue in accordance with the Second Remand Order, the Department is using the date of invoice as the date of sale for HYSCO's U.S. sales."  *Second Remand*

*Redetermination* 39.  Commerce found that "record evidence reconsidered in response to the

Second Remand Order indicates that the terms of sale were subject to change after shipment."

*Id.* at 40.  Because that finding is supported by substantial record evidence, and because

Commerce acted in accordance with its regulation, 19 C.F.R. § 351.401(i), the court affirms the

decision to base the dates of sale of HYSCO's merchandise on the invoice dates.

   HYSCO contests the Department's new decision, arguing, *inter alia*, that substantial

evidence does not support the Department's finding that a material term of sale was subject to

change after shipment, that the record evidence instead demonstrates establishment of the

material terms of sale upon the date of shipment, and that Commerce impermissibly departed

from its long-standing practice, under which shipment date is used as the date of sale if it

precedes the invoice date.  HYSCO's Comments 3-12.

   The court rejects HYSCO's arguments concerning the state of the record evidence.  In the

Second Remand Redetermination, Commerce placed weight on HYSCO's own questionnaire

response, noting that "HYSCO specifically reported that '{n}egotiations with customers can

continue through the entire sales process' and that 'for U.S. sales, quantity can also change up

until the merchandise is shipped from HYSCO's factory, and price can change up until {its U.S.

subsidiary} HHU issues its invoice to the unaffiliated U.S. customer.'"  *Second Remand*

*Redetermination* 40 (quoting HYSCO's Comments 23-24).  Pointing out that "[i]t is well

established that price is a material term of sale," Commerce stated that it "is relying on

HYSCO's own statement that the price could change between the time of shipment and invoice."

*Id.* at 42 (citation omitted).  HYSCO alludes to "other record evidence," HYSCO's Comments 6,

but fails to make the case that Commerce erred in reaching the finding that price was subject to

change after shipment.

HYSCO's argument that Commerce impermissibly departed from its long-standing practice of using shipment date as the date of sale if it precedes invoice date is also unconvincing.  The pertinent regulation, 19 C.F.R. § 351.401(i), establishes what at least must be regarded as a "practice" for the use of invoice date except in a situation in which another date better reflects the date on which the material terms of sale were established.  Commerce permissibly found on the record evidence that date of shipment was not such a date because the price term was subject to change thereafter.  On the record before it, Commerce did not err in declining to apply what HYSCO characterizes as a practice when using date of shipment as the date of sale would have been at odds with the Department's own regulation.

### D.  Selection of the Contemporaneous Month

Section 773(a)(1)(A) of the Tariff Act provides as a general matter that normal value is to be based on prices at which the foreign like product is sold in the home market "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(A).  In an administrative review, "[w]hen comparing export prices (or constructed export prices) of individual transactions to the weighted average price of sales of the foreign like product," Commerce "shall limit its averaging of prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale."  19 U.S.C. § 1677f-1(d)(2).

In its regulations, Commerce uses the term "contemporaneous month" to refer to what is, in the words of 19 U.S.C. § 1677f-1(d)(2), "the calendar month that corresponds most closely to the calendar month of the individual export sale."  19 C.F.R. § 351.414(e)(2).  Reflecting the statutory language, the Department's regulations provide as a first preference that the contemporaneous month normally will be the month in which the U.S. sale occurred, i.e., the

month that is exactly contemporaneous.[4]  *Id.* § 351.414(e)(2)(i).  However, if there were no sales

of the foreign like product during that month, Commerce normally will select as the

contemporaneous month "the most recent of the three months prior to the month of the U.S. sale

in which there was a sale of the foreign like product."  *Id.* § 351.414(e)(2)(ii).  If no sale of the

foreign like product occurred during those three months, Commerce normally will select "the

earlier of the two months following the month of the U.S. sale in which there was a sale of the

foreign like product."  *Id.* § 351.414(e)(2)(iii).  The six-month period for comparisons as set

forth in § 351.414(e)(2) is sometimes described as the "90/60 day window period."

        In the Final Results, Commerce deviated from the normal procedure set forth in

§ 351.414(e)(2), limiting comparisons of individual U.S. sales to home market sales of the

foreign like product that occurred during the same quarter of the twelve-month POR.  *See Union*

*Steel I*, 837 F. Supp. 2d at 1325-26.  Commerce explained that "when applying the alternative

[i.e., quarterly] cost averaging methodology due to significantly changing costs, the Department

has in the past eliminated the '90/60' day window period . . . .  That is, the sales

'contemporaneity' period was modified to conform with the shortened cost averaging period."

*Decision Mem.* 20.

---

[4] Section 351.414(e)(2) of the Department's regulations provides as follows:

    (2) Contemporaneous month.  Normally, the Secretary will select as the
    contemporaneous month the first of the following which applies:
        (i) The month during which the particular U.S. sale under consideration was made;
        (ii) If there are no sales of the foreign like product during this month, the most recent
        of the three months prior to the month of the U.S. sale in which there was a sale of the
        foreign like product.
        (iii) If there are no sales of the foreign like product during any of these months, the
        earlier of the two months following the month of the U.S. sale in which there was a
        sale of the foreign like product.

19 C.F.R. § 351.414(e)(2).

Because Commerce based its decision to use a shortened, quarterly comparison window period, instead of the usual 90/60 day window period, on its use of quarterly cost methodology, and because Commerce itself sought to reconsider some aspects of its use of the quarterly cost methodology in the fifteenth review, the court ordered that Commerce also "reconsider its associated decision to depart from the normal method of determining the contemporaneous month that is described in 19 C.F.R. § 351.414(e)(2)."  *Union Steel I*, 36 CIT at __, 837 F. Supp. 2d at 1326.

In the First Remand Redetermination, Commerce decided to make no change to its method of selecting the contemporaneous month.  In explaining the decision, Commerce said, *inter alia*, that it was appropriate to match sales only within the same quarter because "comparing home market sales from one quarter to U.S. sales during another quarter of the POR when the unadjusted comparison market price does not reflect the contemporaneous price changes that have occurred through the date of the U.S. sale distorts the dumping analysis." *First Remand Redetermination* 29.

In *Union Steel II*, the court found inadequate the Department's explanation for deviating from the normal procedure set forth in the regulation, § 351.414(e)(2).  Focusing on the point that a comparison window that is shortened by half, i.e., from six months to three months, would be expected to produce fewer matches of identical products (in favor of matches of similar merchandise or, absent such a match, the use of constructed value) and thereby sacrifice some identical matches for the sake of some form of contemporaneity, the court concluded that Commerce did not explain how its method produced the most accurate dumping margin.  *Union Steel II*, 38 CIT at __, 968 F. Supp. 2d at 1315.  Also, the court observed that the *method* by which Commerce shortened the comparison window "largely dispensed with the hierarchy,

reflected in § 351.414(e)(2), of matching a U.S. sale with earlier months of home market sales

before resorting to subsequent months in a situation where no match could be made in the month

in which the U.S. sale occurred." *Id.* The First Remand Redetermination, in the court's view,

"does not explain why Commerce chose a method that deviated significantly from this

hierarchy," giving as an example that "if a U.S. sale made in the first month of a quarter had no

match in the month in which it occurred, it could not be matched with a home market sale (or

sales) occurring in the immediately preceding month, despite the preference embodied in the

regulation for the use of earlier months before the use of later months." *Id.* (footnote omitted).

The court ordered Commerce to reconsider its methodology "and, in so doing, address the two

specific issues the court has raised." *Id.* In the Second Remand Redetermination, Commerce

decided, again, to leave unchanged its method of selecting the contemporaneous month, and in

explaining its decision responded to both of the issues raised in *Union Steel II*.

In addressing the issues the court raised, Commerce referred to its findings that

"respondents' costs increased significantly throughout the POR (*i.e.*, the increase exceeded the

25-percent threshold), and the sales prices were reasonabl[y] correlated to the movement of costs

throughout the POR." *Second Remand Redetermination* 26-27 (footnote omitted). The

Department's concern over significantly changing costs that are reasonably correlated with

prices is that "the effects of time can distort the dumping analysis," which distortion Commerce

sought to minimize by shortening the comparison window. *Id.* at 23. According to Commerce,

absent an effort to eliminate this distortion, "the Department would not simply be measuring

pricing behavior, but it would also include the impact of price differences that result from

differences over time." *Id.* at 25.

Regarding the effect on accuracy of shortening the six-month 90/60 day window period

to a three-month period, Commerce acknowledged that "[t]his is admittedly a difficult question

in that there are two competing forces at play: the preference for identical price-to-price

comparisons, and the concern about the timing of price-to-price comparisons when costs are

changing significantly throughout the POR and prices are reasonably correlated to the changing

costs." *Id.* at 26.  Answering this question, Commerce concluded that "[i]n light of these record

facts," i.e., significantly changing costs and reasonable correlation with prices, "it is reasonable

for the Department to be concerned about straying too far from the month of each U.S. sale in

trying to find a NV [normal value] based on comparison market sales prices." *Id.* at 27.

Commerce reasoned that "[t]he need to take steps to minimize the distortion that time has on cost

and price comparisons outweighs the need to find every identical match possible in cases like

this one where there are significant cost changes and reasonably correlated prices." *Id.* at 24.  In

that regard, Commerce cited data relating to the matches it performed for HYSCO and Union

from which it concluded that lengthening the comparison window according to the 90/60 day

normal procedure would have changed only a relatively small percentage of matches "from

similar matches to identical matches." *Id.* at 28.

<u>1.  Departure from the Normal Procedure of 19 C.F.R. § 351.414(e)(2)</u>

Commerce did not act contrary to law in deciding to depart from the 90/60 day normal

procedure of § 351.414(e)(2).  Based on record evidence, Commerce reached valid findings that

Union's and HYSCO's costs of steel substrate varied significantly over the course of the POR

and reasonably were correlated with prices.  The court finds satisfactory the Department's

explanation for its decision to depart from the normal procedure set forth in the regulation, based

on the effect that significantly changing costs, when reasonably correlated with prices, can be

expected to have on meaningful comparisons between U.S. prices and normal value.

Union and Dongbu do not argue that Commerce's findings as to significantly changing

costs or correlation with prices were, *per se*, invalid. Instead, they argue that the Department's

explanation for departing from the 90/60 day window period is conclusory, and its decision

unsupported by substantial record evidence, because Commerce has not identified record

evidence that distortions in the dumping analysis actually would have occurred were the usual

comparison window to have been used. Union's Comments 3-4; Dongbu's Comments 3-5. This

argument fails to persuade the court. Were the standard comparison window of § 351.414(e)(2)

to have been used, the price of a U.S. sale occurring, for example, near the end of a month of the

POR could be compared with the price, or the weighted average of prices, in a sale or sales

occurring at the beginning of the month that was three months earlier, i.e., a span of nearly four

months. Where costs were changing significantly over the period (and were reasonably

correlated with pricing changes), the price in the U.S. sale would be compared with the price or

prices in a sale or sales with a significantly different cost structure. By providing that Commerce

"normally" will use the § 351.414(e)(2) method, the regulation left Commerce discretion to

shorten the comparison window to avoid such a length of time between a U.S. sale and the sale

or sales in the comparison market. In other words, the Department's objective was to address the

"distortion" that is inherent in the significantly varying cost structure and the correlation with

prices. Union and Dongbu have not made the case that Commerce was obligated to demonstrate

"distortion" beyond the findings that it made.

Union and Dongbu argue, further, that the 25 percent threshold Commerce applied to

determine whether cost fluctuations were significant was not a sufficient basis upon which to

base departure from the 90/60 day window period.  According to their argument, Commerce

needed to find significant cost and price variations between quarters, and not merely over the

entire POR.  Union's Comments 6; Dongbu's Comments 5-6.  But neither plaintiff has offered a

convincing reason why Commerce, despite the discretion allowed by its regulation, was required

to impose a higher threshold for cost differences, and for correlation with prices, than it did.  The

generalized allegation that the threshold Commerce used resulted in a decision unsupported by

substantial evidence is insufficient.  Because it points to no specific factual finding by

Commerce that was unsupported, this argument reduces to a claim that the Department's

methodology itself was flawed.  That Commerce could have demanded higher variability with

cost or price before departing from the method of § 351.414(e)(2) does not establish the

invalidity of the threshold Commerce chose.

Pointing to the Department's own finding that the shortened comparison window resulted

in fewer matches of identical merchandise, Union argues that "[a]lthough Commerce seeks to

characterize the reduction in identical matches as small, the fact of the matter is that this is *actual*

evidence that Commerce's methodology does not result in the most accurate matches possible"

and that "[t]he statute contains a preference for the use of identical matches – period."  Union's

Comments 4 (citations omitted).  Similarly, Dongbu asserts that the overarching obligation to

achieve accuracy is not served by deviating from the normal procedure of 19 C.F.R.

§ 351.414(e)(2).  Dongbu's Comments 3-4.  These arguments, too, are unpersuasive.  The

preference in the statute for identical matches (*see* 19 U.S.C. § 1677(16)) does not stand in

isolation.  Congress also provided that Commerce "shall limit its averaging of prices to a period

*not exceeding the calendar month* that *corresponds most closely* to the calendar month of the

individual export sale."  19 U.S.C. § 1677f-1(d)(2) (emphasis added).  Thus, in two respects

Congress expressed a preference for matches that occur relatively close in time: Commerce may

not use an averaging period exceeding one month to determine normal value based on prices in

comparison-market sales, and contemporaneity with the U.S. sale is the principle by which

Commerce is to choose that month.  Contrary to the premise underlying Union's and Dongbu's

arguments, Congress identified both a preference for identical matches and a preference for

contemporaneity as considerations underlying the concept of accuracy in the determination of a

dumping margin.[5]

### 2.  Matching Each U.S. Sale Only to Sales Made During a Month Occurring in the Same Quarter of the Period of Review

In the Second Remand Redetermination, Commerce responded to the issue the court

raised as to the hierarchy reflected in the Department's regulation, 19 C.F.R. § 351.414(e)(2).

Commerce presented three reasons for its retaining its method of shortening the comparison

window.

Commerce explained, first, that the "quarterly" method it followed sought to preserve the

hierarchy within the confines of its quarterly approach, i.e., as limited by the objective of

---

[5] Union also argues that had Commerce considered the comparison window to also
include the 90-day period before the start of the POR and the 60-day period at the end of the
POR, the reduction in identical matches caused by the Department's decision not to use the
90/60 day comparison window of 19 C.F.R. § 351.414(e)(2) would have been far greater than
Commerce estimated.  Comments of Union Steel on the U.S. Department of Commerce's
Aug. 1, 2014 Results of Redetermination Pursuant to Remand 5-6 (Sept. 16, 2014), ECF
Nos. 231 (Conf.), 232 (Public) ("Union's Comments").  Defendant argues that because Union
failed to raise this objection in commenting on the draft version of the Second Remand
Redetermination, on which Commerce invited comments before submitting the Second Remand
Redetermination to the court, Union failed to exhaust its administrative remedies on this
argument.  Def.'s Resp. to Comments on the Second Results of Redetermination Pursuant to
Court Remand 14 (Oct. 29, 2014), ECF Nos. 244 (Conf.), 245 (Public).  The court agrees with
defendant but notes that Union's argument would not be persuasive in any event because
Commerce acted within its discretion in balancing the statutory objectives of maximizing
identical matches and ensuring contemporaneity.

matching a U.S. sale only to a home market sale occurring within the same quarter of the POR.

Specifically, Commerce stated that "its comparison window period method under the quarterly-

cost methodology still follows the hierarchy of first trying to find a match in the month of the

U.S. sale, then going back one month, then two (as long as doing so remains with the given

quarter), then forward one month, then two (again as long as doing so remains within the given

quarter)." *Remand Redetermination* 29.

Second, as a reason for limiting matches to a sale or sales made during a month occurring

in the same quarter of the POR, Commerce explained that it "limited the normal 90/60 day

window to the quarterly window period in order to be consistent with the period used to calculate

the COP, the CV and the DIFMER adjustment." *Id.* Commerce added that its "reasoning is that

if it considers it inappropriate to compare sales prices with quarterly COPs or CVs incurred

outside of the quarter in which the sale occurred, then it is similarly inappropriate to compare

U.S. sales prices occurring in a given quarter to NVs based on comparison market sales prices

occurring in a quarter outside of that in which the U.S. sale occurred." *Id.*

Third, Commerce gave, as a reason underlying its decision, its objective of adopting a

"standard approach" of using only matches within the same quarter when it shortens the

comparison window in a case in which it calculates costs (for example, for COP, CV, and

DIFMER purposes) on a quarterly basis. Commerce stated that it "needs to adopt a predictable

method that is consistently applied, and, unless there are specific facts in an investigation or a

review that warrant deviation from the normal alternative-quarterly-cost-method approach, the

Department should follow its standard approach, which necessitates departing from the hierarchy

prescribed by 19 CFR 351.414(e)(2)." *Id.* at 32.

In objecting to the Second Remand Redetermination, Union and Dongbu argue that in

shortening the six-month comparison window, Commerce impermissibly departed from the

hierarchy principle embodied in § 351.414(e)(2).  Union's Comments 10-12; Dongbu's

Comments 8-11.  Alluding to the hierarchy principle, Union argues that "absolutely nothing in

the regulation indicates that Commerce may *vary* the order of preference for selecting the

'contemporaneous month' based upon where each month of the POR falls within the arbitrarily

defined 'quarters' used for cost averaging," Union's Comments 7; *see also* Dongbu's

Comments 9.  Union argues, further, that "nothing in the text of 19 C.F.R. § 351.414(e)(2) or in

the rulemaking proceeding leading to its proposal and adoption suggests that the definition of

'contemporaneous month' is dependent, either logically or legally, on the time period over which

Commerce averages *costs* for purposes of COP, CV, and the DIFMER adjustment."  Union's

Comments 7.  Dongbu makes essentially the same argument.  Dongbu's Comments 9.  The gist

of Union's and Dongbu's arguments is that Commerce could have, and according to its

regulation should have, preserved the hierarchy principle of § 351.414(e)(2) even upon

shortening the comparison window, and that a desire to adhere to the four quarters of the POR

for price comparisons was not a valid reason to do otherwise.

Commerce adopted the hierarchy principle as an exercise of its rulemaking discretion in

promulgating § 351.414(e)(2).  Union's and Dongbu's arguments overlook the point that by

using the word "normally" in the text of the regulation, Commerce has reserved for itself the

discretion as to whether or not to depart from that principle.  In conducting the fifteenth review,

Commerce could have adopted any of various approaches to limiting the time period for price

comparisons; for example, it could have modified the normal procedure to create a three-month

comparison window in a way that, in the absence of a comparison market sale occurring in the

month of the U.S. sale, looked to the prior month for a match or matches before considering

matches in the month after the U.S. sale occurred.  This would have preserved the general

hierarchy principle of § 351.414(e)(2) in all instances, regardless of whether the prior month

occurred in the same quarter as the U.S. sale.  Under such a procedure, the comparison window

would be confined to a three-month period, although not necessarily the three-month period of

an established quarter of the POR.  It could be argued that this procedure would have addressed

the Department's desire to avoid comparing a U.S. sale to a sale or sales that occurred too

remotely in time, while still preserving the hierarchy principle.  It could be argued, further, that

this procedure would better ensure contemporaneity than the procedure Commerce used, because

the comparison market sale or sales would be used only if occurring no more than two months

from the date of the U.S. sale, whereas under the procedure Commerce adopted in the review and

maintained through the Second Remand Redetermination, the period of separation could be as

much as three months (where a U.S. sale occurring on the last day of a quarter is compared to a

home market sale or sales occurring on the first day of that quarter).

       Where, as here, neither the antidumping statute nor the applicable regulation, 19 C.F.R.

§ 351.414(e)(2), requires a specific procedure, Commerce must be accorded significant

discretion on its choice of methodology.  A reviewing court must exercise caution before

disturbing the exercise of that discretion.  In light of that discretion, it was reasonable for

Commerce to regard changing production costs, as generally reflected in prices, to relate to the

question of the timing, i.e., the contemporaneity, of price-to-price comparisons between U.S. and

home market sales.  Similarly, after finding a correlation between costs and prices, Commerce

acted within its discretion in adopting a procedure that allowed conformity between the quarterly

basis of its calculation of production costs for COP, CV and DIFMER and the quarterly basis

upon which it would compare U.S. and home market prices.  Essentially, the two plaintiffs object

on conceptual grounds that Commerce was required to regard quarterly calculation of costs for

COP, CV, and DIFMER as distinct from the question of whether price comparisons should be

confined to the same quarters used for those cost calculations.  Union's Comments 12; Dongbu's

Comments 11 ("The former is a cost issue and the latter is a price-to-price comparison issue.").

But here, it is sufficient that Commerce permissibly found costs to have varied significantly over

the course of the POR and to have been reasonably correlated with prices and that it considered

COP (i.e., as used for determining whether to exclude from normal value below-cost home

market sales), CV, and DIFMER also to be based on costs.[6]  The Department's analysis

recognizes that COP and CV relate to the determination of normal value, and DIFMER, as

applied by Commerce, is an adjustment to normal value.  In the context of comparing normal

value to U.S. price, as a matter of consistency Commerce permissibly preferred that U.S. sales

occurring in an established quarter of the POR be compared with a sale or sales of the foreign

like product occurring in that same quarter.

---

[6] Union and Dongbu claim that in explaining its decision Commerce illogically cited
19 U.S.C. § 351.414(d)(3), which addresses the time period for average-to-average comparisons
rather than average-to-transaction comparisons, and the Statement of Administrative Action
accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) at 843,
which addresses constructed value, neither of which Union and Dongbu consider to be relevant
to the issue of departure from the normal method of § 351.414(e)(2).  Union's Comments 11-12;
Comments of Dongbu Steel on the U.S. Department of Commerce's Aug. 1, 2014 Results of
Redetermination Pursuant to Remand 9-10 (Sept. 16, 2014), ECF No. 233.  The court agrees that
these citations are not directly relevant to the issue presented; however, the Second Remand
Redetermination can be interpreted to rely upon these sources only for the general point that
Commerce, which in some instances may use nonstandard time periods for cost averaging, also
may deviate from its normal procedure when performing price comparisons affected by cost
changes.  In any event, the Department's including these citations does not support a conclusion
that the general factors upon which Commerce relied for its decision, which the court discussed
*supra*, are unreasonable.

Moreover, Commerce has responded in the Second Remand Redetermination to the issue the court raised as to the hierarchy principle by explaining the grounds that comprise the Department's reasoning.  The considerations the Department identified, i.e., the desire to maintain consistency between the time period for its price comparisons and the quarterly basis of its three types of cost calculations, and the desire to further the interest of predictability by continuing to apply its "standard," i.e., quarterly, approach to matching when departing from the normal method of § 351.414(e)(2), cannot be characterized as unreasonable when viewed in light of the discretion Commerce possesses.

If the court were to accept and act upon Union's and Dongbu's abstract objections to the Department's methodological choice, it would be substituting its own judgment for that of the agency.  Because Commerce must be allowed discretion in its choice of methodology, the question posed by its choice is not whether a reviewing court, were it to exercise its own judgment as to what would be an ideal approach for shortening the comparison window and thereby departing from the normal procedure of § 351.414(e)(2), would have preferred Commerce to have used a different method.  Instead, the question is whether Commerce has acted within its discretion in making that methodological choice and, in response to the issues the court raised in *Union Steel II*, has provided a rational explanation for it.  The court concludes that Commerce has satisfied both of these requirements.  The court, therefore, will affirm the Department's decision to use only those matches between U.S. sales and comparison market sales that occurred during the same quarter of the POR.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court affirms the Second Remand

Redetermination and will enter judgment accordingly.[7]

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  December 15, 2016
         New York, New York

---

[7] Upon review and recalculation, the Second Remand Redetermination revised Union's margin slightly, from 9.85% to 9.83%. *Results of Redetermination Pursuant to Remand* (Aug. 1, 2014) 44, ECF Nos. 222 (Conf.), 223 (Public) (*"Second Remand Redetermination"*). Because no party commented on this minor adjustment, the court affirms the Department's final determination of 9.83% as Union's margin.